UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF TENNESSEE

NASHVILLE DIVISION

| | |
|---|---|
| GLENN SAITO, BARRY LAI, MYRON NAKATA, ROBERT FUJIKAWA, ARTHUR B. TOLENTINO, RICK PAULINO, JEANINE LUM, PAUL FUJINAGA, BLAKE PARSONS, ROGER T. NAGATA and ALDON KAOPUIKI as TRUSTEES of the HAWAII SHEET METAL WORKERS PENSION FUND, Derivatively on Behalf of DOLLAR GENERAL CORPORATION, <br><br> Plaintiffs, <br><br> vs. <br><br> TODD VASOS, MICHAEL M. CALBERT, WARREN F. BRYANT, SANDRA B. COCHRAN, PATRICIA D. FILI-KRUSHEL, PAULA A. PRICE, WILLIAM C. RHODES III, DAVID B. RICKARD and JOHN W. GARRATT, <br><br> Defendants, <br><br> – and – <br><br> DOLLAR GENERAL CORPORATION, a Tennessee corporation, <br><br> Nominal Defendant. | Civil Action No. <br><br> VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, ABUSE OF CONTROL, GROSS MISMANAGEMENT AND UNJUST ENRICHMENT <br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br> DEMAND FOR JURY TRIAL |

## OVERVIEW OF THE ACTION

1.      This is a shareholder derivative action on behalf of nominal defendant Dollar General Corporation ("Dollar General" or the "Company") against its Board of Directors (the "Board"), Chief Executive Officer and Chief Financial Officer (collectively, "defendants") for breach of fiduciary duty, abuse of control, gross mismanagement and unjust enrichment.

2.      Dollar General is a discount retailer in the United States with stores in 44 states, including Alabama, Arizona, Arkansas, Connecticut, Florida, Georgia, Kentucky, Maryland, Massachusetts, Mississippi, Missouri, New Jersey, New York, North Carolina, Oregon, Pennsylvania, South Carolina, Tennessee and West Virginia.  While Dollar General offers a variety of products, consumables are the Company's largest merchandise category, representing over 75% of the Company's net sales for the past three years.

3.      As a discount retailer specializing in consumables, Dollar General's core customers are low-income and fixed-income households, many of whom qualify for the Supplemental Nutrition Assistance Program ("SNAP").  SNAP provides low-income, senior, disabled and other qualified individuals with electronic benefits usable as cash for the purchase of food items.

4.      Beginning in 1996, SNAP contained a limitation that only allowed unemployed individuals to receive benefits during three months out of any 36-month period, unless those individuals were also disabled or raising minor children.  However, in 2008, many states waived this limitation in the aftermath of the financial crisis and developing recession.  But by April 2016, given the improving U.S. economy, approximately 22 states – including each of those listed above – had announced plans to re-implement the limitation on SNAP benefits.  As a result, an estimated one million consumers would have their SNAP benefits terminated.

5.      To allay concerns over the anticipated widespread SNAP benefit cuts, between at least February 2016 and December 2016, defendants caused Dollar General to engage in a positive –

albeit false – public relations campaign designed to downplay the impact that the reduction in SNAP benefits would have, and was having, on Dollar General's present and future revenue, net income and earnings growth. For example, in annual and quarterly filings with the Securities and Exchange Commission ("SEC") on March 22, 2016 and May 26, 2016, defendants caused the Company to report positive results and expectations, with anticipated continued net sales growth driven primarily by consumables. Defendants, however, caused Dollar General to misrepresent the true condition of its business by failing to disclose that, because 56% of Dollar General stores located in states that had re-implemented the limitation on SNAP benefits were impacted by the announced benefit reductions, the SNAP benefit reductions would have, and were having, a disproportionate impact on the Company's sales relative to the overall percentage of sales comprising SNAP payments.

6. As a result of defendants' false and misleading statements, Dollar General common stock traded at artificially inflated prices throughout much of 2016.

7. The true impact that the reduction in SNAP benefits would have on Dollar General's business remained hidden from the public until August 25, 2016, when defendants caused the Company to announce its fiscal 2016 second quarter results, which fell short of market expectations. On this news, the trading price of Dollar General's stock collapsed $16.18 per share, over 17%, instantly wiping out more than $4 billion in shareholder equity. Although defendants attributed Dollar General's disappointing results in part to "'a reduction in both SNAP participation rates and benefit levels,'" they failed to disclose the full impact that the SNAP reductions were having on the Company's bottom line.

8. Ultimately, on December 1, 2016, defendants were forced to acknowledge the full extent of the adverse impact the reduction in SNAP benefits available to Dollar General's core customers was having, and would continue to have, on the Company's performance. In announcing the Company's fiscal 2016 third quarter financial results, defendants caused the Company to report a

same-store sales decrease of 0.1%, the first such decline reported by the Company in 26 consecutive years.  During a conference call following these results, defendant Vasos admitted:

> [I]f you look at [the SNAP headwind], it affects about 56% of our store base in the states that have reduced or eliminated the SNAP benefits and those states that have . . . had the reduction or elimination, they are approximately . . . 100 basis points worse than comp.  That gives you a real good idea of how impactful those SNAP benefits – reductions have been.

9.      On this news, the trading price of Dollar General's stock declined further, falling another $3.84 per share, instantly wiping out another $1 billion in shareholder equity.  Worse yet, the Company has been named as a primary defendant in costly and expensive-to-defend class action lawsuits brought by Dollar General shareholders for alleged violations of the federal securities laws.

10.     Although Dollar General has been severely injured, defendants have not fared nearly so badly.  In 2016, defendants collectively pocketed more than $12 million in compensation not justified by Dollar General's performance while under their stewardship.  These payments unjustly enriched defendants at the Company's expense.

11.     Nevertheless, the Board has not, and will not, commence suit against defendants for breach of fiduciary duty, abuse of control, gross mismanagement and/or unjust enrichment, let alone vigorously prosecute such claims.  Accordingly, by this action, plaintiffs seek to vindicate Dollar General's rights against its wayward fiduciaries.

## JURISDICTION AND VENUE

12.     This Court has jurisdiction under 28 U.S.C. §1332(a)(2) because plaintiffs and defendants are citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs.  This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

13.     This Court has jurisdiction over each defendant because each defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual

who has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by the District courts permissible under traditional notions of fair play and substantial justice.

14. Venue is proper in this Court under 28 U.S.C. §1391(a) because: (i) Dollar General maintains its principal place of business in the District; (ii) one or more of the defendants either resides in or maintains executive offices in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein and aiding and abetting and conspiracy in violation of fiduciary duties owed to Dollar General, occurred in this District; and (iv) defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## PARTIES

15. Plaintiffs Glenn Saito, Barry Lai, Myron Nakata, Robert Fujikawa, Arthur B. Tolentino, Rick Paulino, Jeanine Lum, Paul Fujinaga, Blake Parsons, Roger T. Nagata and Aldon Kaopuiki pursue this action in their capacity as Trustees of Hawaii Sheet Metal Workers Pension Fund, which is a Dollar General shareholder and has continuously held Dollar General stock since at least April 2011. Plaintiffs are citizens of the State of Hawaii.

16. Nominal defendant Dollar General is a Tennessee corporation headquartered at 100 Mission Ridge, Goodlettsville, Tennessee 37072. Dollar General is a citizen of the State of Tennessee.

17. Defendant Todd Vasos has served as Chief Executive Officer ("CEO") of Dollar General since June 3, 2015. Vasos has also been a director of Dollar General since June 3, 2015. Additionally, Vasos has served as a senior executive at Dollar General since December 2008. In 2016, Vasos received $8,593,288 in salary, bonuses and other incentive compensation from Dollar

General not justified by the Company's performance while under his stewardship. Vasos is a citizen of the State of Tennessee.

18.     Defendant Michael M. Calbert has served as a director of Dollar General since 2007. Calbert has also served as Chairman of the Board since January 30, 2016. In 2016, Calbert received $437,837 in directors' fees and other compensation from Dollar General not justified by the Company's performance while under his stewardship. Calbert is a citizen of the State of California.

19.     Defendant Warren F. Bryant has served as a director of Dollar General since 2009. Bryant is also a member of the Board's Audit Committee and is the Chair of the Compensation Committee. In 2016, Bryant received $247,488 in directors' fees and other compensation from Dollar General not justified by the Company's performance while under his stewardship. Bryant is a citizen of the State of Washington.

20.     Defendant Sandra B. Cochran has served as a director of Dollar General since 2012. Cochran is also a member of the Board's Audit Committee and Nominating and Governance Committee. In 2016, Cochran received $222,988 in directors' fees and other compensation from Dollar General not justified by the Company's performance while under her stewardship. Cochran is a citizen of the State of Tennessee.

21.     Defendant Patricia D. Fili-Krushel has served as a director of Dollar General since 2012. Fili-Krushel is also a member of the Board's Compensation Committee and Nominating and Governance Committee. In 2016, Fili-Krushel received $222,988 in directors' fees and other compensation from Dollar General not justified by the Company's performance while under her stewardship. Fili-Krushel is a citizen of the State of New York.

22.     Defendant Paula A. Price has served as a director of Dollar General since 2014. Price is a member of the Board's Audit Committee. In 2016, Price received $222,982 in directors' fees

and other compensation from Dollar General not justified by the Company's performance while under her stewardship. Price is a citizen of the State of Massachusetts.

23. Defendant William C. Rhodes III has served as a director of Dollar General since 2009. Rhodes is a member of the Board's Compensation Committee and serves as the Chair of its Nominating and Governance Committee. In 2016, Rhodes received $237,988 in directors' fees and other compensation from Dollar General not justified by the Company's performance while under his stewardship. Rhodes is a citizen of the State of Tennessee.

24. Defendant David B. Rickard has served as a director of Dollar General since 2010. Rickard is the Chair of the Board's Audit Committee. In 2016, Rickard received $245,488 in directors' fees and other compensation from Dollar General not justified by the Company's performance while under his stewardship. Rickard is a citizen of the State of Florida.

25. Defendant John W. Garratt has served as Executive Vice President and Chief Financial Officer ("CFO") of Dollar General since December 2, 2015. In 2016, Garratt received $2,130,012 in salary, bonuses and other incentive compensation from Dollar General not justified by the Company's performance while under his stewardship. Garratt is a citizen of the State of Tennessee.

26. Defendants, and each of them, received Dollar General's earning reports before or shortly after their issuance. Nevertheless, defendants each failed to prevent their issuance or correct their false and misleading content, thereby breaching their fiduciary duties owed to Dollar General and its shareholders. Moreover, defendants, and each of them, because of their positions and access to material non-public information, knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations that were being made were therefore materially false and misleading.

## THE FIDUCIARY DUTIES OF DOLLAR GENERAL'S
## OFFICERS AND DIRECTORS

27.     Each officer and director of Dollar General owed the Company and its shareholders the duty to exercise a high degree of care, loyalty and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of Dollar General's directors and officers complained of herein involves fraudulent misconduct – a knowing, intentional and culpable violation of their obligations as directors of Dollar General and the absence of good faith on their part concerning their duties to the Company and its shareholders.  The misconduct of Dollar General's officers has been ratified by Dollar General's Board, which has failed to take any legal action on behalf of the Company against them.

28.     By reason of their positions as officers, directors and/or fiduciaries of Dollar General and because of their ability to control the business and corporate affairs of Dollar General, defendants owed Dollar General and its shareholders fiduciary obligations of candor, trust, loyalty and care and were required to use their ability to control and manage the Company in a fair, just, honest and equitable manner and to act in furtherance of the best interests of Dollar General and its shareholders, so as to benefit all shareholders equally and not in furtherance of their personal interests or benefit.  In addition, as officers and/or directors of a publicly held company, defendants had a duty to promptly disseminate accurate and truthful information with respect to the Company's operations, projections and forecasts, so as to (i) fulfill their duty of candor and honesty to Dollar General's existing shareholders; and (ii) so that the market price of Dollar General's stock would be based on truthful and accurate information.

29.     Defendants, because of their positions of control and authority as directors and/or officers of Dollar General, were able to and did, directly and indirectly, control the wrongful acts complained of herein.  Because of their executive and directorial positions with Dollar General, each

defendant had access to adverse non-public information about the financial condition, operations, and future business prospects of Dollar General and was required to disclose it promptly and accurately to Dollar General's shareholders and the financial markets but did not do so.

30. The Charter of the Audit Committee of the Dollar General Board confirms the obligation of each defendant serving on the Company's Audit Committee to honestly and truthfully prepare and present the Company's financial results and statements. Specifically, to discharge their duties, the members of Dollar General's Audit Committee were required to exercise reasonable and prudent supervision over: (i) the integrity of the Company's financial statements; (ii) the Company's compliance with legal and regulatory requirements; and (iii) the performance of the Company's internal audit function and independent auditors. By virtue of such duties and by the terms of the Audit Committee Charter, the Audit Committee members of Dollar General's Board were required, among other things, to:

7. Review and discuss with management and the independent auditors:

- The Company's annual audited financial statements and quarterly unaudited financial statements. This review must be conducted at a meeting (whether in person, telephonic or otherwise) and must include a review of the Company's specific disclosures under MD&A. The Committee shall recommend to the Board whether the annual audited financial statements should be included in the Company's Form 10-K.

                    *        *        *

- Analyses prepared by management and/or the independent auditors setting forth significant financial reporting issues and judgments made in connection with the preparation of financial statements, including analyses of the effects of alternative GAAP methods on the financial statements.

                    *        *        *

- Any other matters required to be communicated to the Committee by the independent auditors pursuant to applicable rules of the Public Company Accounting Oversight Board.

8. Discuss the Company's earnings press releases, as well as financial information and earnings guidance provided to analysts and rating agencies. This discussion may be general (i.e., in terms of the types of information to be disclosed

and the type of presentation to be made, paying particular attention to the use of "pro forma" or "adjusted" non-GAAP information), and the Committee need not discuss in advance each earnings release or each instance in which the Company may provide earnings guidance.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

31.     In committing the wrongful acts complained of herein, defendants pursued or joined in the pursuit of a common course of conduct and acted in concert with one another in furtherance of a common plan or design.  In addition to the wrongful conduct complained of herein giving rise to primary liability, defendants further aided and abetted and/or assisted each other in breach of their fiduciary duties.

32.     Each of the defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such action to substantially assist the commission of the wrongdoing complained of herein, each defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

## FACTUAL ALLEGATIONS

33.     Based in Goodlettsville, Tennessee, Dollar General is a discount retailer located in 44 states whose primary customers are low-income and fixed-income households that disproportionately qualify for and utilize SNAP.  Beginning in 1996, state governments limited SNAP benefits to no more than three months out of any 36-month period for unemployed individuals who were not disabled or raising minor children.  The 2008 financial crisis, however, led many states to waive this limitation to help struggling low- and fixed-income families.  But, by early 2016, at least 22 states had announced plans to re-implement the limitation on SNAP benefits beginning in April 2016.

34.     Due to Dollar General's dependence on low-income and fixed-income consumers, this development presented a significant danger to Dollar General's prospects for future revenue, net

income and earnings growth. However, rather than acknowledge the potential and actual impact of this adverse development on the Company, defendants caused Dollar General to embark upon on public relations campaign designed to convince shareholders that the reduction in SNAP benefits would not, and did not, meaningfully impact the Company's financial performance.

35.     Towards that end, on March 10, 2016, defendants caused the Company to release its fiscal 2015 fourth quarter and year-end financial results. In the March 10, 2016 release, defendants caused the Company to report same-store sales growth for the year of 2.8%, projected earnings per share ("EPS") growth of 10% to 15% for fiscal 2016, and annual same-store sales improvement of 2% to 4%. The March 10, 2016 release further stated, in relevant part, as follows:

> "2015 was another great year for Dollar General as we achieved strong financial results with a focus on profitable sales growth. ***For the 26th consecutive year, we delivered positive same-store sales growth***. In the fourth quarter, we effectively balanced sales and operating profit through our toughest quarterly comparison of the year to deliver record results leading to full year diluted EPS growth of 13%," said Todd Vasos, Dollar General's chief executive officer.

> "***Looking ahead, Dollar General continues to have significant opportunities for growth***. The goal of our long-term growth model that we announced today is to drive 11% to 17% total annual shareholder return per year through EPS growth and dividend yield. Considering the financial results we have delivered over the last three years and consistent with how we are managing the business, our growth model is focused on increasing longterm shareholder value by driving profitable sales growth, capturing growth opportunities, enhancing our position as a low-cost operator and investing in our people. For 2016, we plan to return approximately $1.3 billion to shareholders through anticipated quarterly cash dividends and consistent share repurchases."

> Vasos continued, "The Company remains well-positioned to serve our customers with value and convenience. We continue to take the appropriate strategic steps to ensure that we are investing in the Company for sustainable and consistent growth."

36.     As to the Company's financial growth outlook, the March 10, 2016 release stated, in relevant part, as follows:

> The Company has established a financial growth model that is focused on long-term shareholder value creation. Key components of the model include:

| Key Drivers | Annual Target |
|---|---|
| Net Sales | +7 to 10% |
| - Square Footage | +6 to 8% |
| - Same-Store Sales | +2 to 4% |
| Operating Profit | +7 to 11% |
| Diluted Earnings per Share | +10 to 15% |
| Cash from Operations | 7 to 8% of Sales |
| Capital Expenditures | 2 to 3% of Sales |
| Annual Shareholder Return (EPS Growth + Dividend Yield) | +11 to 17% |

For the 53-week fiscal year ending February 3, 2017 ("fiscal 2016"), the Company expects the 53rd week to contribute approximately 200 basis points to its net sales performance and $0.09 per diluted share to EPS.

Including the impact of the 53rd week, the Company expects its fiscal 2016 net sales and diluted EPS results to be at the high end of the ranges outlined in the growth model above. Same-store sales growth for fiscal 2016 is forecasted to be near the middle of the range as outlined in the growth model above.

The Company plans to open approximately 900 new stores and relocate or remodel 875 stores in fiscal 2016. Capital expenditures for fiscal 2016 are expected to be in the range of $550 million to $600 million.

The Company intends to update its diluted EPS guidance only if the Company no longer reasonably expects diluted EPS to fall within the 10 percent to 15 percent range outlined in the growth model above. The Company does not intend, and specifically disclaims any duty, to update its expectations regarding where in the range of guidance fiscal 2016 net sales, same-store sales or diluted EPS may fall, or to update any component of the growth model outlined above, other than diluted EPS as specified herein. The Company also does not intend, and specifically disclaims any duty, to update its dollar range for expected fiscal 2016 capital expenditures unless otherwise required by applicable securities laws.

37. That same day, defendants hosted a conference call for shareholders and analysts. During the conference call, an analyst asked about announced reductions in SNAP benefits and whether these benefit reductions would have an impact on the Company's bottom line. In response, defendant Vasos falsely stated that the reduction in SNAP benefits would not have a significant negative impact on the Company's financial results. The discussion was as follows:

[Analyst Meredith Adler:] But I think the FDA is talking about making some changes to qualify for SNAP. And I'm wondering if you guys are looking at that and kind of what you think that means for your business.

[Vasos:] Meredith, we are watching that and we, as you know and you mentioned earlier, SNAP for us is approximately 5% of our sales. So it really has – it's not a huge piece of the business . . . .

38.     On March 22, 2016, defendants caused Dollar General to file with the SEC its Annual Report on Form 10-K for the fiscal 2015 fourth quarter and year, ended January 30, 2016. The Form 10-K, which was reviewed and approved by the Board and signed by defendants Vasos, Garratt, Bryant, Calbert, Cochran, Fili-Krushel, Price, Rhodes and Rickard, reiterated the Company's fourth quarter and year-end financial results reported on March 10, 2016, and stated:

Our operating priorities continue to evolve as we consistently strive to improve our performance while retaining our customer-centric focus. We are keenly focused on executing the following priorities: 1) driving profitable sales growth, 2) capturing growth opportunities, 3) enhancing our position as a low-cost operator, and 4) investing in our people as a competitive advantage.

*          *          *

In 2016, we plan to continue to focus on our four key operating priorities. *We expect our sales growth in 2016 to again be driven primarily by consumables*, although we expect non-consumables sales to continue to contribute to our profitable sales growth. *Same-store sales growth is key to achieving our objectives, and we have implemented targeted actions to drive same-store sales in 2016*, such as updating our customer segmentation to gain deeper insights into the spending habits for each of our core customer segments. This helps drive our category management process, as we optimize our assortment and expand into those categories that are most likely to drive traffic to our stores. Our continued focus on on-shelf availability and affordability also should assist in growing transactions and number of items sold. Our new store format will offer a total of 22 cooler doors, an increase of six cooler doors as compared to our previous new store format and will be utilized for all new stores, relocations and remodels.

39.     Defendants' statements referenced in ¶¶35-38 were materially false and/or misleading when made because they misrepresented the true condition of Dollar General's business by failing to disclose that, because 56% of Dollar General stores located in states that had re-implemented the time limitation on SNAP benefits were impacted by the announced benefit reductions, the SNAP benefit reductions would have a disproportionate impact on the Company's sales relative to the overall percentage of sales comprising SNAP payments. As a result, defendants' statements about

- 12 -

Dollar General's business, operations and prospects were materially false and misleading and lacked a reasonable basis.

40.     On May 26, 2016, defendants caused the Company to release its fiscal 2016 first quarter financial results. For the quarter, defendants caused the Company to report net income of $295 million, or $1.03 per diluted share, compared to net income of $253 million in the previous year's comparable quarter, and a 2.2% quarterly increase in same-store sales. The May 26, 2016 earnings release further stated, in relevant part, as follows:

> "***Dollar General had a strong start to the year with our first quarter 2016 results. Compared to the first quarter of 2015, same-store sales improved 2.2%***. We remained keenly focused on ensuring the effectiveness and efficiency of every aspect of our business as we delivered both gross margin expansion and selling, general and administrative expense leverage. This balanced performance contributed to operating profit improvement of 12% and diluted earnings per share growth of 23%. ***We are confident in our opportunities for growth*** and remain committed to creating sustainable long-term shareholder value," said Todd Vasos, Dollar General's chief executive officer.

41.     That same day, defendants caused Dollar General to file with the SEC its quarterly report on Form 10-Q for the fiscal 2016 first quarter, ended April 29, 2016. The Form 10-Q, which was reviewed and approved by the Board and signed by defendant Garratt, reiterated the Company's fiscal 2016 first quarter financial results and stated:

> Our operating priorities continue to evolve as we consistently strive to improve our performance while retaining our customer-centric focus. We are keenly focused on executing the following priorities: 1) driving profitable sales growth, 2) capturing growth opportunities, 3) enhancing our position as a low-cost operator, and 4) investing in our people as a competitive advantage.

> *               *               *

> ***In 2016, we expect our net sales growth to continue to be driven primarily by consumables***, although we expect non-consumables sales to continue to contribute to our profitable sales growth. ***Same-store sales growth is key to achieving our objectives***, and we are expanding our sales-driving initiatives such as cooler expansion into existing stores. An additional targeted action to drive same-store sales growth is updating our customer segmentation to gain deeper insights into the spending habits for each of our core customer segments. This helps drive our category management process, as we optimize our assortment and expand into those categories that are most likely to drive traffic to our stores.

- 13 -

42. That same day, defendants hosted a conference call for shareholders and analysts in which defendant Vasos reiterated the Company's strong quarterly financial results, stating that "[s]ame-store sales growth was positive for both consumables and non-consumables, with growth stronger across our consumable categories."

43. Defendants' statements referenced in ¶¶40-42 were materially false and/or misleading when made because they misrepresented the true condition of Dollar General's business by failing to disclose that, because 56% of Dollar General stores located in states where the re-implemented time limitation on SNAP benefits had already taken effect would be, and in fact were being, impacted by the announced benefit reductions, the SNAP benefit reductions would have, and were having, a disproportionate impact on the Company's sales relative to the overall percentage of sales comprising SNAP payments. As a result, defendants' statements about Dollar General's business, operations and prospects were materially false and misleading and lacked a reasonable basis.

44. Defendants' scheme continued unabated until August 25, 2016, when defendants caused the Company to release its fiscal 2016 second quarter financial results, reporting net income of $307 million, or $1.08 per diluted share, compared to net income of $282 million in the previous year's comparable quarter. Defendants explained, however, that same-store sales growth would only be 0.7% for the quarter due in part due to "'a reduction in both SNAP participation rates and benefits levels.'" Specifically, the August 25, 2016 earnings release stated, in relevant part, as follows:

> "We are pleased with our 2016 second quarter diluted earnings per share growth of 14 percent over the 2015 second quarter, although our same-store sales performance fell short of our expectations. Retail food deflation and *a reduction in both SNAP participation rates and benefit levels*, coupled with unseasonably mild spring weather, *proved to be stronger than expected headwinds to our business*. The competitive environment also intensified in select regions of the country. Importantly, even amidst a challenging sales environment, we effectively managed our gross profit margin and leveraged our selling, general and administrative expense as a percent of sales," said Todd Vasos, Dollar General's chief executive officer.
>
> "*For the second half of the year, we have action plans across both merchandising and store operations intended to drive same-store sales while*

*maintaining strict expense control discipline*. Looking ahead, we remain focused on our long-term strategy to invest for growth while also returning cash to shareholders through consistent share repurchases and anticipated quarterly dividends."

45.     That same day, defendants hosted a conference call for shareholders and analysts in

which defendant Vasos discussed, but also downplayed, the impact of the SNAP benefit reductions

on the Company's performance, stating as follows:

[Vasos:]  Thank you, Mary Winn, and welcome to everyone joining our call. For the second quarter, we are pleased with our double-digit earnings per share growth even as our same-store sales performance fell short of our expectations. . . .

**Key factors that negatively impacted our expected same-store sales performance included** a greater than anticipated headwind from price deflation across key perishable items with retail prices down about 8% for milk and over 50% for eggs, our two largest products within perishables.

Second, **a reduction of both SNAP participation rates and benefit levels**. Third, an unseasonably mild spring. And lastly, an intensified promotional environment in select regions of the country.

**We estimate that the headwinds from price deflation and the reduction in SNAP benefits negatively impacted our same-store sales for the second quarter** by approximately 60 to 70 basis points.

As I will discuss in more detail later in the call, we are taking aggressive action across merchandizing and store operations to address these factors and help drive same-store sales and we will continue to be very disciplined in our SG&A spending.

*            *            *

[Analyst Dan Wewer:]  Just one other follow-up, the drop in customer transactions per store, I believe that is the first time that has happened since the buyout back in 2008. Where do you think that business shifted? Was it to the mass merchants and perhaps they are able to take advantage of the lower gasoline pricing and their customers becoming more mobile as a result?

[Vasos:]  When we look at it, the headwind of SNAP for us really was a big deal and also our core consumer continues to be under a lot of pressure. I know that when we look at globally the overall US population, it seems like things are getting better but when you really start breaking it down and you look at that core consumer that we serve on the lower economic scale that is out there, that demographic, things have not gotten any better for her. And arguably they are worse and they are worse because rents are accelerating, healthcare is accelerating on her at a very, very rapid

clip. And now you couple that in upwards of 20 states where they have reduced or eliminated the SNAP benefit and it has really put a toll on her.

>   ***That SNAP benefit reduction and/or elimination happened in April. That
>   was the kickoff and you could see it immediately numbers*** [sic]. So I believe those
>   are the things that are affecting her today, again, our core customer. And by the way,
>   ***we have seen this play out before***. If you dial the clock back to October of 2013 and
>   coming into November of 2013 when the last large SNAP benefit reduction
>   happened, it happened almost exactly the same way on our comps and how we saw
>   traffic. Obviously we were up at a little bit higher level at that time but rest assured
>   that our traffic slowed tremendously then, very similar to as it did now.

46.     On this news, the price of Dollar General stock collapsed, falling $16.18 per share, or more than 17%, instantly wiping out $4 billion in once-valuable shareholder equity.

47.     Defendants' statements in ¶¶44-45, however, remained materially false and/or misleading when made because they misrepresented the true condition of Dollar General's business by failing to disclose that, because 56% of Dollar General stores located in states where the re-implemented time limitation on SNAP benefits had already taken effect would be, and in fact were being, impacted by the announced benefit reductions, the SNAP benefit reductions would have, and were having, a disproportionate impact on the Company's sales relative to the overall percentage of sales comprising SNAP payments. As a result, defendants' statements about the Company's business, operations and prospects were materially false and misleading and/or lacked a reasonable basis.

48.     Thereafter, on December 1, 2016, defendants caused the Company to release its fiscal 2016 third quarter financial results, reporting a same-store sales decrease of 0.1%. This was a shocking announcement since, ***up to this point, Dollar General had reported 26 consecutive years of same-store sales increases***. Defendants specifically attributed the Company's poor performance to "'an acceleration in headwinds from . . . reductions in SNAP benefits in the 2016 third quarter as compared to the 2016 second quarter.'" Defendants also modified the Company's annual earnings guidance, stating that EPS would be at the low end of the Company's previous guidance range of 10% to 15% growth.

49. That same day, defendants hosted a conference call for shareholders and analysts in which defendant Vasos admitted to the adverse impact the reduction in SNAP benefits was having on the Company's performance, stating as follows:

> [Analyst Alison Levens:] Great, thanks, very helpful. And then just as a follow-up, can you provide more detail regarding what changed with respect to the SNAP headwinds in 3Q versus 2Q?

> [Vasos:] Yes, you know, when we look at it – it was about the same. When we look at our SNAP affected states, I'll give you a little color; really what's interesting here is a lot like Q2, Q3 was pretty close to about the same but if you look at it, ***it affects about 56% of our store base*** in the states that have reduced or eliminated the SNAP benefit and those states that have – that have had the reduction or elimination, they are approximately a 100 basis points worse than comp. That gives you a real good idea of how impactful those SNAP benefits – reductions have been. Again, we feel it's transitory, we'll move through that as we move through 2017 but right now that's why we've really taken a real hard look at reducing prices for those core consumers, especially given around those states because they need this right now based on what we see.

50. On this news, the price of Dollar General stock declined another $3.84 per share, or nearly 5%, wiping out another $1 billion in once-valuable shareholder equity. Worse yet, the Company has been named as a primary defendant in costly and expensive-to-defend class action lawsuits brought by Dollar General shareholders for alleged violations of the federal securities laws.

## DAMAGE TO DOLLAR GENERAL

51. As a direct and proximate result of defendants' misconduct, Dollar General has been severely damaged and injured. Moreover, defendants' faithless acts and/or omissions have irreparably damaged Dollar General's credibility, corporate image and goodwill. For at least the foreseeable future, Dollar General will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in improper behavior and have misled the investing public, such that Dollar General's ability to raise equity capital or debt on favorable terms in the future is now impaired. Further, as a direct and proximate result of defendants' misconduct, Dollar General has been named a defendant in class action lawsuits for violations of the

federal securities laws. *See, e.g.*, *Iron Workers Local Union No. 405 Annuity Fund v. Dollar General Corp., et al.*, No. 3:17-cv-00063 (M.D. Tenn.).

## DERIVATIVE ALLEGATIONS

52.     Plaintiffs incorporate ¶¶1-51.

53.     Plaintiffs bring this action derivatively on behalf of Dollar General to redress injuries suffered, and to be suffered, by Dollar General as a direct result of defendants' breaches of fiduciary duty, abuse of control, gross mismanagement and unjust enrichment. Dollar General is named as a nominal defendant solely in a derivative capacity. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

54.     Plaintiffs will adequately and fairly represent the interests of Dollar General in enforcing and prosecuting its rights.

55.     As of the date this Complaint was filed, the Dollar General Board had eight members: defendants Calbert, Vasos, Bryant, Cochran, Fili-Krushel, Price, Rhodes and Rickard. Plaintiffs have not made a demand on the Board of Dollar General to institute this action because such a demand would have been a useless and futile act, and is therefore excused, particularly for reasons set forth below.

56.     Any suit by the directors of Dollar General to remedy the wrongs complained of herein would expose defendants themselves and their friends and business allies to significant personal liability for their breaches of fiduciary duties and other misconduct. Defendants Calbert, Vasos, Bryant, Cochran, Fili-Krushel, Price, Rhodes and Rickard have demonstrated their unwillingness and/or inability to act in compliance with their fiduciary obligations and/or to sue themselves and/or their fellow directors for the wrongful conduct described herein. Defendants Calbert, Vasos, Bryant, Cochran, Fili-Krushel, Price, Rhodes and Rickard are accused of wrongdoing and recommending, approving and ratifying the materially false and misleading

statements identified herein and, thus, face a substantial likelihood of liability thereby rendering any demand upon them futile.

57.     The Compensation Committee of the Board, consisting of defendants Bryant, Fili-Krushel and Rhodes, is responsible for approving Dollar General's executive officers' compensation, including that of defendants Vasos and Garratt.  In 2016, defendants Vasos and Garratt received $8.5 million and $2.1 million, respectfully, in total compensation based on their employment as executives of Dollar General.  As the members of the Compensation Committee singularly control approval of defendant Vasos' compensation, defendant Vasos will not institute this action against defendants Bryant, Fili-Krushel and Rhodes.  To do so would jeopardize his personal financial compensation.  Thus, demand on defendant Vasos is futile.

58.     According to the Company's 2016 Proxy Statement, director compensation is "recommended each year by the Compensation Committee, and approved by the Board."  Moreover, Dollar General's Compensation Committee "and the [full] Board retain and exercise ultimate decision-making authority regarding director compensation."  Thus, because each director defendant approves each other director defendant's cash compensation, each director defendant would not institute this action against the other director defendants, as it would jeopardize their personal compensation.  Thus, demand on each of defendants Calbert, Vasos, Bryant, Cochran, Fili-Krushel, Price, Rhodes and Rickard is futile.

59.     Defendants Calbert, Vasos, Bryant, Cochran, Fili-Krushel, Price, Rhodes and Rickard were aware of, participated in, and approved of the wrongs alleged herein.  Thus, defendants Calbert, Vasos, Bryant, Cochran, Fili-Krushel, Price, Rhodes and Rickard have knowingly chosen not to exercise the fiduciary duties of loyalty and due care owed to the Company and protect Dollar General, or to rectify the illegal practices complained of herein.  Defendants Calbert, Vasos, Bryant,

Cochran, Fili-Krushel, Price, Rhodes and Rickard therefore have approved of and continue to participate in a course of corporate misconduct that includes the following:

(a)     Defendants Calbert, Vasos, Bryant, Cochran, Fili-Krushel, Price, Rhodes and Rickard were involved in approving and/or condoning the materially false and misleading statements. Defendants Calbert, Vasos, Bryant, Cochran, Fili-Krushel, Price, Rhodes and Rickard each had the ability and/or opportunity to prevent these practices and did not take action to correct the materially false and misleading statements disseminated to shareholders regarding how changes to SNAP benefits would affect the Company's bottom line. The Board is responsible for overseeing the Company's compliance with legal requirements and, therefore, all directors are liable for not ensuring that the officers and employees of the Company did not expose the Company to unnecessary risk. Because defendants Calbert, Vasos, Bryant, Cochran, Fili-Krushel, Price, Rhodes and Rickard are liable for approving and directing the illegal conduct described herein, demand upon them would be futile.

(b)     Defendants Bryant, Cochran, Price and Rickard serve on the Audit Committee of the Dollar General Board. Members of the Audit Committee, because of their position of control and authority over Dollar General, were able to, and did, directly and indirectly, control the wrongful acts complained of herein. The members of the Audit Committee failed to ensure that the Company had and maintained adequate internal financial controls and failed to ensure the integrity of the Company's public statements regarding the effects the changes in SNAP benefits would have on the Company. Because members of the Audit Committee had an affirmative duty to ensure that the Company's public statements regarding the Company's financial results and prospects were accurate and truthful, and failed to do so, members of the Audit Committee breached their fiduciary obligations due the Company. Accordingly, defendants Bryant, Cochran, Price and Rickard cannot impartially respond to a demand, rendering demand upon them futile.

(c)  Defendants Calbert, Vasos, Bryant, Cochran, Fili-Krushel, Price, Rhodes and Rickard refused to put into place adequate internal controls and adequate means of supervision to stop the wrongful conduct alleged herein despite the fact that the Board knew and/or recklessly ignored such wrongful business practices.  These acts, and the acts alleged in this action, demonstrate a pattern of gross misconduct, which conduct is not taken honestly and in good faith.

60.  Defendants' illegal conduct is not subject to business judgment protection or subject to ratification.

61.  The wrongful conduct complained of herein by defendants Calbert, Vasos, Bryant, Cochran, Fili-Krushel, Price, Rhodes and Rickard amounted to breaches of their fiduciary duties of good faith, due care and loyalty to Dollar General and its shareholders.

62.  Moreover, despite defendants having knowledge of the claims and causes of action raised by plaintiffs, the Board has failed and refused to seek to recover for Dollar General for any of the wrongdoing alleged by plaintiffs herein.

63.  Plaintiffs have not made any demand on Dollar General shareholders to institute this action since such a demand would be a futile and useless act for the following reasons:

(a)  Dollar General is a publicly traded company with over 275 million shares outstanding and thousands of shareholders;

(b)  Making demand on such a number of shareholders would be impossible for plaintiffs who have no way of finding out the names, addresses or phone numbers of shareholders; and

(c)  Making demand on all shareholders would force plaintiffs to incur huge expenses, assuming all shareholders could be individually identified.

## COUNT I

### For Breach of Fiduciary Duty
### Against All Defendants

64.     Plaintiffs incorporate ¶¶1-63.

65.     By their wrongful acts and omissions, defendants breached their fiduciary duties owed to Dollar General and its shareholders.

66.     Here, defendants violated those fiduciary duties by, among other things, making false statements and/or failing to disclose adverse material non-public information regarding Dollar General's business, finances and prospects for future growth in revenues, net income and earnings in the Company's SEC filings and press releases.

67.     As a result of defendants' fiduciary failure, Dollar General has been damaged.

68.     Plaintiffs, on behalf of Dollar General, have no adequate remedy at law.

## COUNT II

### For Abuse of Control
### Against All Defendants

69.     Plaintiffs incorporate ¶¶1-63.

70.     Defendants' misconduct alleged herein constitutes a breach of their fiduciary duties because they abused their ability to control and influence Dollar General, for which they are legally responsible.

71.     As a direct and proximate result of defendants' abuse of control, Dollar General has sustained significant damages.

72.     As a result of the misconduct alleged herein, defendants are liable to the Company.

## COUNT III

### For Gross Mismanagement
### Against All Defendants

73.     Plaintiffs incorporate ¶¶1-63.

74. By their actions alleged herein, defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Dollar General in a manner consistent with the operations of a publicly held corporation.

75. As a direct and proximate result of defendants' gross mismanagement and breaches of duty alleged herein, Dollar General has sustained significant damages.

76. As a result of the misconduct and breach of fiduciary duties alleged herein, defendants are liable to the Company.

## COUNT IV

### For Unjust Enrichment
### Against All Defendants

77. Plaintiffs incorporate ¶¶1-63.

78. By their wrongful acts and omissions, defendants were unjustly enriched at the expense of and to the detriment of Dollar General.

79. All the payments and benefits provided to defendants were at the expense of Dollar General. The Company received no benefit from these payments.

80. Plaintiffs, on behalf of Dollar General, seek restitution from defendants, and each of them, and seek an order of this Court disgorging all profits, benefits and other compensation obtained by these defendants, and each of them, from their wrongful conduct and fiduciary breaches.

81. Plaintiffs, on behalf of Dollar General, have no adequate remedy at law.

### PRAYER FOR RELIEF

WHEREFORE, plaintiffs demand judgment as follows:

A. Against defendants and in favor of the Company for the amount of damages sustained by the Company as a result of defendants' breaches of fiduciary duty, abuse of control, gross mismanagement and unjust enrichment;

B.     Directing Dollar General to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Dollar General and its shareholders from a repetition of the damaging events described herein;

C.     Extraordinary equitable and/or injunctive relief as permitted by law, equity and the state statutory provisions sued hereunder, including attaching, impounding and imposing a constructive trust on or otherwise restricting the proceeds of defendants' trading activities or their other assets so as to assure that plaintiffs on behalf of Dollar General has an effective remedy;

D.     Awarding to Dollar General restitution from defendants, and each of them, including ordering disgorgement of all profits, benefits and other compensation obtained by defendants;

E.     Awarding plaintiffs the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs and expenses; and

F.     Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury.

DATED:  August 10, 2017                    ROBBINS GELLER RUDMAN
                                                          & DOWD LLP
                                                     CHRISTOPHER M. WOOD, #032977


                                        _____*/s/ Christopher M. Wood*_____
                                                     CHRISTOPHER M. WOOD

                                        414 Union Street, Suite 900
                                        Nashville, TN  37219
                                        Telephone:  615/244-2203
                                        615/252-3798 (fax)

ROBBINS GELLER RUDMAN
   & DOWD LLP
DARREN J. ROBBINS
TRAVIS E. DOWNS III
BENNY C. GOODMAN III
ERIK W. LUEDEKE
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)

Attorneys for Plaintiffs

**VERIFICATION**

I, Roger T. Nagata as Administrator of the Hawaii Sheet Metal Workers Pension Fund ("Hawaii Sheet Metal"), acting on behalf of and with the consent of the Hawaii Sheet Metal Board of Trustees, hereby verify that I am familiar with the allegations in the Verified Shareholder Derivative Complaint for Breach of Fiduciary Duty, Abuse of Control, Gross Mismanagement and Unjust Enrichment and that the foregoing is true and correct to the best of my knowledge, information and belief.

I declare under penalty of perjury that the foregoing is true and correct.

HAWAII SHEET METAL WORKERS PENSION FUND

DATED: _8/7/17_        _Roger Nagata_